DISTRICT OF OREGON, ss:          AFFIDAVIT OF KATHERINE NEWMAN

**Affidavit in Support of a Criminal Complaint and Arrest Warrant**

I, Katherine Newman being duly sworn, do hereby depose and state as follows:

1. I am a Special Agent with the Federal Bureau of Investigation and have been since March 2018. My training and experience includes agency specific training in all aspects of conducting federal criminal investigations. I am an "investigative or law enforcement officer of the United States" within the meaning of 18 U.S.C. § 2510(7), authorized to conduct investigations into alleged violations of federal law. In the course of my official duties, I have investigated wire fraud, fraud against the government, and securities fraud cases. I am a graduate of the FBI Academy and have received training in conducting financial investigations. I am currently assigned to the Portland Division of the FBI, where I am responsible for investigating various violations of federal law, specifically those involving fraud.

2. I submit this affidavit in support of a criminal complaint and arrest warrant for JOSEPH GALVAN (hereinafter GALVAN) for Wire Fraud, in violation of 18 U.S.C. § 1343. As set forth below, there is probable cause to believe, and I do believe, that GALVAN committed Wire Fraud, in violation of 18 U.S.C. § 1343.

3. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter. The facts set forth in this affidavit are based on my own personal knowledge, knowledge obtained from other individuals during my participation in this investigation, including other law enforcement officers, interviews of witnesses, a review of records related to this investigation, communications with others who have knowledge of the events and circumstances described

Page 1 – Affidavit of Katherine Newman

herein, and information gained through my training and experience.

## Applicable Law

4. Title 18 U.S.C. § 1343 provides in pertinent part:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

## Statement of Probable Cause

5. As a result of my investigation, as set forth below, I have probable cause to believe that GALVAN has committed wire fraud by devising and intending to devise a material scheme to defraud investors out of money by means of false and fraudulent pretenses, representations, and promises.

6. On or about October 4, 2019, I spoke with State of Oregon Division of Financial Revenue (DFR) Investigator Chris Aldrich, who provided an overview of initial investigation.

7. The information provided by DFR Investigator Aldrich alleged that between January 2018 and the date of this affidavit, GALVAN devised and intended to devise a material scheme to defraud family members and friends of his wife out of approximately $600,000. When GALVAN married his wife, he presented himself as a savvy, high-rolling, investment trader who had allegedly become wealthy from his trading activities. GALVAN promised his wife's family members and friends that if they provided him with funds, he would open investment accounts for them and invest those funds on their behalf, so that they could become financially secure and retire early. The initial investigation by DFR investigator Aldrich

Page 2 – Affidavit of Katherine Newman

indicated that GALVAN used the victims' funds for his own personal benefit and never made the investments on behalf of the victims as promised.

8.  On or about October 1, 2019, DFR Investigator Aldrich interviewed Adult Victim #1 (hereinafter referred to as AV1), who resides in Roseville, California. AV1 is a family member of GALVAN'S wife. GALVAN presented himself to AV1 as a savvy and wealthy businessman who was 50% owner of Columbia Collections Services, a debt collection service, before he allegedly sold it. As part of the material scheme to defraud, GALVAN convinced AV1 to invest in stocks with him, promising AV1 that for every dollar invested, GALVAN would match it with $100.00. GALVAN promised AV1 that AV1 would be able to cash out the original investment within a year. Based on GALVAN'S promises, AV1 made thirteen wire transfer payments from California to GALVAN in Oregon between April 24, 2018 to October 5, 2018, using online third-party payment services Zelle and Venmo. AV1 transferred a total of approximately $91,500 to GALVAN for the investment. AV1 has never received payment of interest on the investment account or a return of the principle from GALVAN as promised.

9.  On October 14, 2019, DFR Investigator Aldrich interviewed Adult Victim #2 (hereinafter referred to as AV2), via telephone. In August 2018, AV2 traveled to California to visit AV1 and some other family members. During the trip, AV2, AV1, and the other family members traveled to Portland, Oregon to visit GALVAN and his wife. While AV2 was in Portland, GALVAN promised to teach AV2 about the stock market and investments over a one to two year period. AV2 wanted to learn about investments, because it is difficult to earn a decent retirement income in the country AV2 is from. GALVAN promised that he would front AV2 an initial $30,000 to open an investment account for AV2. GALVAN told AV2 that he

would transfer the money for the investment to an account under AV2's control at the end of the one to two-year time period. GALVAN promised that in a year, AV2 would be able to cash out the investments. Between January 15, 2019 and February 22, 2019, AV2 sent approximately $33,637 to GALVAN to reimburse GALVAN for the money he allegedly put into AV2's investment account. This amount was AV2's entire life savings.

10. As part of the material scheme to defraud, GALVAN sent AV2 screenshots of the investment activity, and discussed AV2's investment account with AV2 via mobile phone or on Facebook. On August 30, 2018, during an online Facebook session, GALVAN sent the following message to AV2, "I know this is A LOT OF money for you. And I will take care of it. One of the reasons why I invested in advance for you, besides the fact the stock market is hot and you don't want to lose that opportunity is so you could see how well your money will grow. And I will never let you lose your money. Even if something crazy happened, which has never happened, I would pay you out of my own funds. I would do the same with [AV1 and AV1's spouse]. But- yes- it is far easier for you, in January, to invest especially when I hope to have you close to 60K by then. Don't worry. You won't lose the money. I will never allow that." AV2 has not received any return of principle or any interest payments from GALVAN.

11. On September 27, 2019, DFR Investigator Aldrich interviewed Adult Victim #3 (hereinafter referred to as AV3) via telephone. AV3 met GALVAN through GALVAN'S wife at a college graduation party in Seattle, Washington, in June 2018. In March 2019, AV3 and other members of the family traveled to Portland, Oregon to visit GALVAN and his wife. During the visit, GALVAN invited AV3 to be part of his investment program. AV3 had heard from other family members that GALVAN had been successful with their investment accounts. As part of

the material scheme to defraud, GALVAN promised AV3 that for every dollar invested, GALVAN would match it with $100.00, and in a year, AV3 would be able to cash out the investments. Based on GALVAN'S promises, AV3 wired approximately $31,500 to GALVAN's BBVA Compass Bank account and Zelle account between March 2019 and August 2019. AV3 has not received any interest payments or return of the principle investment from GALVAN as promised.

12.     On October 4, 2019, DFR Investigator Aldrich interviewed Adult Victim #4 (hereinafter referred to as AV4) via telephone. AV4 first met GALVAN at a family gathering in Lynnwood, Washington in January 2019. In March 2019, AV4's relative advised the family that GALVAN was a successful investor in the stock market, and that GALVAN had helped his in-laws with their financial situation. AV4 decided to participate in GALVAN's investment program to help AV4's parents. GALVAN promised that the investment would provide enough returns so that AV4's parents could retire in two to four years. GALVAN promised that he would invest the funds provided by the family, and he would leave the money in the investment account for two to four years until the balance reached $15 million. Once the account reached $15 million, AV4's parents could do as they pleased with the money.

13.     Soon after AV4 invested money for AV4's parents, GALVAN persuaded AV4 to open a personal investment account. Between March 22, 2019 and June 2, 2019, AV4 wired approximately $14,000 from a bank account in Washington to GALVAN in Oregon. GALVAN has not made any interest payments to AV4, and has not returned any of AV4's principle.

14.     On October 11, 2019, DFR Investigator Aldrich interviewed Adult Victim #5 (hereinafter referred to as AV5), a friend of GALVAN'S wife. In March 2019, AV5 traveled

from Washington to Portland to visit GALVAN and his wife. On the trip, GALVAN told AV5 that he was a very successful investor who had been investing in the stock market since 2010. During that trip, GALVAN showed AV5 that he had approximately $10,000 of cash in his pocket. Before the trip was over, GALVAN convinced AV5 to invest in his program. As part of the material scheme to defraud, GALVAN promised AV5 that for every $1.00 AV5 invested, GALVAN would match it with $100.00. AV5 would be able to cash out the investment within a year. Based on GALVAN's promises, AV5 wired approximately $60,000 from a personal Chase Bank account in Washington to GALVAN's BBVA Compass Bank account on March 26, 2019. GALVAN had not repaid principle or made any interest payments to AV5. AV5 lost approximately $85,000 as the result of GALVAN'S material scheme to defraud.

15. On October 31, 2019, I interviewed Adult Victim #6 (hereinafter referred to as AV6), a family member of GALVAN's wife. AV6 said that at the beginning of 2019, GALVAN pitched a story to his in-laws and family that he had been very successful with investments, and that he wanted the same financial success for the family. GALVAN told AV6 and the rest of the family that he wanted nothing more than for everyone to have a good life and to retire early. On approximately March 24, 2019, GALVAN gave his investment pitch in an online group chat with all the investors. During the course of the group chat, GALVAN promised that for every dollar they invested, GALVAN would match it with $100.00. GALVAN promised that the investors would be able to cash out the original investments within a year.

16. Based on GALVAN'S promises, AV6 sent $7,000 to GALVAN via PayPal, an online third-party payment service, on March 30, 2019. On June 25, 2019, AV6 sent an

/ / /

additional $38,000 wire transfer to GALVAN's bank BBVA Compass Bank account. GALVAN has not made repayment of principle or any interest payments to AV6 as promised.

17.     According to AV6, any time investors would request to withdraw money for their earnings, GALVAN would tell them that there would be a penalty to withdraw before the expiration of a 12-month period.  Investors became anxious about their investments with GALVAN, but he told them to be patient.  As part of the material scheme to defraud, and to lull investors into a false sense of security about their investments, GALVAN would periodically send screenshots of investor profiles to each of the investors.  GALVAN would also send, via an online group chat, reports on how their stock choices supposedly did at the end of each day.

18.     AV6 began to have suspicions about GALVAN, and wanted to know the plan for his investments.  Every time AV6 asked GALVAN about the plan in the online group chat, GALVAN would send AV6 a private text with an angry, aggressive tone.  GALVAN was very defensive of his investment methods and provided an explanation for everything.

19.     On March 23, 2020, I interviewed Adult Victim #7 (hereinafter referred to as AV7) via telephone.  AV7 is a relative of GALVAN'S wife.  AV7 first met GALVAN in or about December 2017.  GALVAN'S wife told AV7 that family members' investments with GALVAN went from $15,000 to approximately $100,000 in three months.  GALVAN told AV7 that he would teach AV7 how to invest.  At the beginning of AV7's investment, GALVAN promised that for every dollar AV7 invested, he would put in $10.00.  GALVAN's plan was to get AV7's investment account to ten million dollars.  GALVAN promised AV7 that he would be able to cash out the investment within a year.  All of GALVAN'S promises persuaded AV7 to

/ / /

invest with GALVAN. On or about November 8, 2018, AV7 wired approximately $40,000 from a bank account in Washington to GALVAN's BBVA Compass Bank account.

20. When AV7 tried to take out the investment at the one-year mark, GALVAN promised to put in $50.00 for every additional dollar AV7 put in. As time passed, GALVAN promised a $100.00 to $1.00 return on investment.

21. In addition to AV7's initial investment, GALVAN asked AV7 to pay small increments of money ranging from approximately $1,000 to $2,000 to GALVAN's Venmo account. The money AV7 sent to GALVAN through Venmo was for the investments of AV7 and AV7's family members.

22. From November 7, 2018 to June 23, 2019, AV7 sent a total of 18 wire transfers to GALVAN, investing a total of $83,050. AV7 has not heard from GALVAN since approximately August 2019, and GALVAN has not paid any of AV7's principle or interest.

23. In or about mid-August 2019, investors AV1, AV2, AV3, AV4, AV5, AV6, and AV7 made a formal and official request of GALVAN through certified mail, Facebook message, text message and email, for the return of their principle investments. The formal and official letter requested that GALVAN return all of the investors' principle investments by 5:00 p.m. on Thursday, August 15, 2019. After investors served this letter, GALVAN claimed that he was dedicating his time to work on his marriage. The investors reiterated their official demand with the deadline of August 15, 2019. GALVAN threatened to take legal action, but then offered to pay investors within 45-60 days. Investors reiterated their deadline one last time, and GALVAN withdrew his offer and again threatened legal action. GALVAN neither returned any of the principle investments to his investors, nor paid them any interest.

24.     On June 17, 2020, AV6 provided me with a screenshot of a text message between GALVAN and investors. The screenshot showed GALVAN sending the investors the following:



25.     A financial analysis of GALVAN'S bank accounts and accounts at third-party payment processors reveals that GALVAN deposited all of the investors' funds into his personal bank accounts, then subsequently spent the money on various personal/lifestyle expenses, including: rent, car payments, travel, dining, food, and voluntary cosmetic surgery procedures. There is no evidence that GALVAN worked as a legitimate financial investment advisor, that he opened investment accounts on behalf of the victims, or that he made any investments for the benefit of the investors, as he promised he would.  The victims lost approximately $600,000 as the result of GALVAN'S material wire fraud scheme.

## Conclusion

26.     Based on the foregoing, I have probable cause to believe, and I do believe, that JOSEPH GALVAN committed Wire Fraud, in violation of Title 18 U.S.C. § 1343.  I therefore request that the Court issue a criminal complaint and arrest warrant for JOSEPH GALVAN.

27.     Prior to being submitted to the Court, this affidavit, the accompanying complaint and the arrest warrant were all reviewed by Assistant United States Attorney (AUSA) Claire M. Fay and AUSA Fay advised me that in her opinion, the affidavit and complaint are legally and factually sufficient to establish probable cause to support the issuance of the requested criminal complaint and arrest warrant.

## Request for Sealing

28.     It is respectfully requested that the Court issue an order sealing, until further order of the Court, all papers submitted in support of the requested criminal complaint and arrest warrant.  I believe that sealing these documents is necessary, because the information herein is relevant to an ongoing investigation, and any disclosure of the information at this time may

endanger the life or physical safety of an individual, cause flight from prosecution, cause destruction of or tampering with evidence, cause intimidation of potential witnesses, or otherwise seriously jeopardize an investigation. Premature disclosure of the affidavit, the criminal complaint, and the arrest warrant may adversely affect the integrity of the investigation.

*Sworn by Phone IAW Fed. R. Crim. P. 4.1*
KATHERINE NEWMAN
Special Agent, FBI

Sworn in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone at ___4:39___ a.m./p.m. on July 31, 2020.

*[signature: Jolie A. Russo]*
HONORABLE JOLIE A. RUSSO
United States Magistrate Judge

Page 11 – Affidavit of Katherine Newman